Carol RATTO, Plaintiff,

v.

SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.

Civ. No. 92–1383–JE.

United States District Court, D. Oregon.

Aug. 13, 1993.

Drew L. Johnson, Johnson Cram & Harder, Eugene, OR, for plaintiff.

Craig J. Casey, U.S. Attorney's Office, Portland, OR, Richard Wetmore, Dept. of Health and Human Services, Region X, Seattle, WA, for defendant.

## ORDER

ROBERT E. JONES, Judge:

Magistrate John Jelderks filed Findings and Recommendation on June 24, 1993 in the above entitled case. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). When either party objects to any portion of a magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate's report. *See* 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Plaintiff has timely filed objections. I have, therefore, given *de novo* review of Magistrate Jelderks' rulings.

I find no error with Magistrate Jelderks' factual findings. I agree that the Secretary's decision is not supported by substantial evidence and that plaintiff has been disabled since August 24, 1985. However, I also agree with one of plaintiff's two objections to Magistrate Jelderks' recommendation.

Magistrate Jelderks recommends payment to plaintiff beginning on the date of her initial application for benefits, March 17, 1986. Rather, plaintiff is entitled to benefit payments commencing February 25, 1986, at the end of the five-month waiting period required by 42 U.S.C. § 423. *See* 42 U.S.C.

§ 423(b) ("An individual who would have been entitled to a disability insurance benefit for any month had he filed application therefor before the end of such month shall be entitled to such benefits for such month if such application is filed before the end of the 12th month immediately succeeding such month.").

Plaintiff's second objection is based on a mistaken belief that Magistrate Jelderks recommended her benefits run only through March 3, 1992, the date of her hearing before the ALJ. Rather, Magistrate Jelderks "express[ed] no opinion as to plaintiff's condition subsequent to March 3, 1992" and recommended that the case be remanded for a determination of benefits. I agree with Magistrate Jelderks' recommendation.

I ADOPT Magistrate Jelderks' Findings and Recommendations dated June 24, 1993, as modified by this Order.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

JELDERKS, United States Magistrate Judge:

Plaintiff Carol Ratto brings this action for judicial review of the Secretary's final decision denying Title II disability insurance benefits. This court has jurisdiction under 42 U.S.C. § 405(g). For the reasons set forth below, the decision of the Secretary should be reversed and remanded for a determination of benefits.

## PROCEDURAL BACKGROUND

Plaintiff first applied for Title II benefits on March 17, 1986. Tr. 114–17. The application was denied, both initially and upon reconsideration. Tr. 125–28, 138–39. Plaintiff subsequently filed a new application for Title II benefits, with a protective filing date of October 31, 1989. Tr. 163–67. This claim was also denied initially, upon reconsideration, and upon re-reconsideration. Tr. 177–80, 190–91, 323–24. ALJ Kramer held a hearing on March 3, 1992. Tr. 53. On July 15, 1992, the ALJ issued an opinion finding plaintiff not disabled. Tr. 21–30. On October 6, 1992, the Appeals Council declined review. Tr. 5–6.

## STATEMENT OF THE FACTS

Plaintiff was born January 27, 1947, making her 45 years old at the time of the hearing. Tr. 114. She has a ninth grade education, and an estimated IQ of 82. Tr. 10, 348. Plaintiff has performed past relevant work as a dining room cashier, cook, sales clerk, cook's helper, hospital cleaner, keno runner, packager, and receptionist. Tr. 28–29.

Plaintiff injured her back in August, 1985. Dr. Deane Stites, an orthopedic surgeon, subsequently examined plaintiff and diagnosed an "acute low back strain with right sciatica and congenital right pars interarticularis defect at L5/S1 with nerve root irritation at this level." Tr. 222. Dr. Stites prescribed conservative treatment, including bed rest, muscle relaxants, and oral analgesics. *Id.* Plaintiff did not respond well to that therapy. Tr. 222–24. A computerized tomography ("CT") scan on November 22, 1985 showed bulging discs diffusely at L3–4, L4–5, and L5–S1, along with interarticular part defects at L5 but no disc herniation. Tr. 225, 227.

By January 22, 1986, plaintiff was still unable to work. *Id.* Dr. Stites recommended she not return to her present employment, which involved heavy lifting, but instead be retrained for a more sedentary position that did not require any lifting, stooping, or bending. *Id.* He also recommended a back brace and physical therapy. *Id.* Although plaintiff occasionally showed some signs of improvement, with decreasing pain and increased mobility, on the whole her condition continued to deteriorate. Tr. 230–31.

On March 17, 1986, plaintiff filed for Title II disability benefits. She reported pain from sitting or standing too long, and that lifting and pushing caused pain to run down her leg. Tr. 148. The SSA employee who interviewed plaintiff noted she "seems to be in some pain after sitting in one position very long." Tr. 155. On May 12, 1986, Dr. Stites noted plaintiff "still continues to do quite poorly," and proposed cortisone treatment.

Tr. 231. Dr. Stites subsequently referred plaintiff to Dr. Patrick Herz, an orthopedic back specialist. *Id.* Dr. Herz noted plaintiff suffered from significant limitations on motion, chronic pain, some numbness and muscle weakness. Tr. 236, 356–57. A myelogram and CT scan were negative for any impingement syndromes, nerve compressions, disc problems or stenosis. Tr. 233, 238–40. Dr. Herz diagnosed a Grade I spondylolysis [1] and spondylolisthesis [2] at L5–S1 and recommended surgery. Tr. 233, 236. Dr. Stites concurred. Tr. 243.

In August, 1986, plaintiff underwent an L5–S1 fusion, decompression, removal of loose fragments of bone, and nerve root exploration. Tr. 233, 251–53. While plaintiff was in the hospital undergoing spinal fusion surgery, the Secretary denied her application for disability benefits on grounds she was responding well to conservative treatment. Tr. 118–25. The Secretary also completed a Residual Functional Capacity Assessment ("RFC") stating plaintiff had unlimited capacity to lift weights, stoop, crawl, stand, walk, or sit. Tr. 121.

Plaintiff requested reconsideration, stating she was in a body cast, no longer able to make a bed, cook, lift pots or pans, dress herself, or drive, and was tired all the time. Tr. 159. The Secretary again denied her claim, this time on grounds the surgery had gone well and her condition was showing significant improvement. Tr. 133, 138. The Secretary revised the RFC to restrict the amount of weight she could lift, but otherwise deemed her capacity for work unrestricted. Tr. 133, 135. None of the doctors who approved the Secretary's original findings or the findings on reconsideration actually examined plaintiff. Plaintiff did not appeal the Secretary's decision.

Plaintiff initially responded well to the surgery. Her pre-operative back pain and numbness were largely gone, though she was still suffering pain at the bone graft site and anterior thigh pain secondary to nerve root irritation and swelling. Tr. 233. Shortly thereafter, plaintiff re-injured her back while trying to move an appliance in her home. Tr. 358. X-rays showed the spinal fusion was healing properly, and Dr. Herz initially diagnosed a simple muscle strain. *Id.* However, the pain persisted, and plaintiff reported shooting pains in her left leg. *Id.* Dr. Herz suggested an MRI, but the test was terminated after plaintiff suffered an acute claustrophobic episode. Tr. 359.

In February, 1987, another CT scan was performed. The results were essentially negative, with no sign of disc herniation, or nerve root impingement, or other explanation for her leg pains. Tr. 359. Dr. Herz concluded her symptoms were continuing pain from her spondylolisthesis. *Id.* His notes show plaintiff was very frustrated that her back and leg pains were persisting after the surgery. *Id.* In March, 1987, plaintiff reported considerable improvement in her condition. Tr. 359. In late July, plaintiff's condition deteriorated again. She suffered severe attacks of sciatica which caused her to seek treatment at the hospital emergency room. Tr. 360. Her back pains also became chronic. *Id.* She complained of chronic back pain, sciatica, and back spasms throughout 1987. *Id.* CT scans showed no evidence of nerve root impingement. Tr. 256, 361. Dr. Herz suspected the pain was being caused by an internal derangement of the lumbosacral disc, anteriorly, which could only be remedied by an anterior lumbar interbody fusion. Tr. 360. Dr. Herz recommended monitoring the situation for the time being, with further surgery being a last resort. Tr. 360–61.

1. Spondylolysis is a degenerative arthritis, osteoarthritis, of the cervical or lumbar vertebrae and related tissues. It may cause pressure on nerve roots with subsequent pain or paresthesia in the extremities. Taber's Cyclopedic Medical Dictionary, 16th Edition (1989).

2. Spondylolisthesis is a condition in which a *congenital defect in the neural arch of the vertebra* causes one vertebra to slip forward upon another. The extent of slippage is classified into one of four grades: Grade I is a 25% slip over the underlying vertebra, and grade IV is a complete slip. If forward slippage greater than grade I is noted, surgical repair in the form of a posterior spinal fusion is indicated. Ausman & Snyder's Medical Library (Lawyer's Edition) (1989) § 4:35.

In March, 1988, a discography[3] was performed in an effort to verify Dr. Herz's tentative diagnosis. The test was inconclusive because doctors were unable to insert a needle containing the contrast medium into the 5–1 interspace. Tr. 260, 362. A pain management program was suggested as a possible alternative to surgery. Plaintiff agreed to participate, but her insurance carrier reportedly balked at paying. Id.

Plaintiff did not often see a physician for her back problems in the ensuing months, though she apparently continued to take medication previously prescribed.[4] She did see Dr. Herz once in October, 1988. Tr. 362. Plaintiff also saw a Dr. Phillip Middleton from February 1988 through November 1988. Tr. 344. Dr. Middleton's complete report is not in the administrative record, but he was apparently treating her for psychological problems, including recurrent nightmares, sleep disturbances, marital difficulties, and fear of medical treatment. Tr. 344. In November, 1988, plaintiff began seeing the doctors at the Truckee Tahoe Medical Group ("TTMG") for most of her medical problems. One of those problems was anxiety, for which Dr. Englesby prescribed Xanax in January, 1989. Tr. 269. In April, 1989, plaintiff was hospitalized after complaining of chest pain that left her tense, apprehensive, lightheaded, and short of breath. Tr. 270. A medical examination disclosed no apparent physical cause for her complaints. Tr. 270–72.

In July, 1989, plaintiff volunteered for a vocational rehabilitation assessment program. In preparation, plaintiff completed a self-assessment of her physical capabilities. She reported being unable to walk for more than a block, stand for more than 20 minutes, sit for more than 15–20 minutes, lift more than 8–12 pounds, or carry a bag of groceries more than one hundred feet. Tr. 275–77. She also reported difficulty with bending, pushing/pulling, driving, and descending stairs, but had no difficulty with reaching or handling objects. Id. Plaintiff stated that in a typical day, she would arise at 6:00 to 6:30 a.m., check the mail, visit with her daughter, wash, iron, prepare dinner, and visit friends or watch television. Tr. 277. She had to rest several times throughout the day. Id.

In August, 1989, plaintiff traveled to Sacramento for the vocational assessment program. The program counselors report that plaintiff appeared to give it her best effort, but was unable to complete the program. Tr. 286. Plaintiff was reportedly in considerable pain, yet persisted in trying to complete the program until the counselors finally barred her from further participation. Tr. 286–91. The counselors concluded plaintiff "was not presently a suitable candidate for vocational rehabilitation services." Tr. 286.

On November 6, 1989, plaintiff filed a new application for Title II disability benefits, with a protective filing date of October 31. Tr. 163–64, 198–205. Plaintiff reported being in more pain than before the surgery. Tr. 198. She also reported being unable to sit or stand more than 5–10 minutes, and needing help to roll over so she could get out of bed. Id. Plaintiff reported being able to cook only one meal a day, twice a week; wash dishes once a day, twice a week; make the bed 5 days a week; and go shopping with her husband once a week providing he carried the groceries. Tr. 201. She reported her social and recreational activities were limited to watching television while lying down, and a 20–minute visit to her in-laws once a month, providing her husband drove and she could take a pain pill and lie down when she got home. Id. She also complained of headaches. Tr. 198.

On November 17, 1989, at plaintiff's request, Dr. Timothy Heilman at TTMG examined her back and prepared a report for submission to SSA assessing her ability to work. Tr. 284. Dr. Heilman's report, dated December 1, 1989, appears to be based in part upon his own tests and in part upon plaintiff's subjective account of her symptoms. Tr. 284, 292. Dr. Heilman concluded

---

**3.** A discography is a diagnostic test during which an absorbable contrast medium is injected directly into the disk, which is then x-rayed. Dorland's Illustrated Medical Dictionary (26th Edition).

**4.** Those medications included Isoptin (verapamil hydrochloride), Disalcid (salsalate) and propoxyphene napsylate (Darvocet–N). Tr. 208, 218, 295, 350.

plaintiff had significant limitations on her ability to lift weights or bend. Tr. 292. He reported plaintiff could stand or walk (with normal breaks) for less than 2 hours in an 8–hour workday, and sit (with normal breaks) for less than 6 hours in an 8–hour workday. *Id.* Dr. Heilman opined that plaintiff's push/pull capacity was not limited except for the stringent restrictions Dr. Heilman had already imposed upon plaintiff's ability to lift (e.g. no more than five pounds for a total of 15 minutes). *Id.* Finally, Dr. Heilman noted plaintiff had told him that sitting for any prolonged time period caused back pain. *Id.* Dr. Heilman subsequently wrote a letter stating that on the basis of his November 17, 1989 examination of plaintiff, he believed she was "unable to sit or stand for periods longer than 5 minutes without increased low back pain." Tr. 298.

The Secretary denied plaintiff's new application for benefits with little explanation. Tr. 177. Dr. Heilman's report was not mentioned in the determination notice. Tr. 175, 177. The Secretary found plaintiff was capable of sitting at least 6 hours in an 8–hour workday, and standing or walking at least 2 hours. Tr. 170. The basis for that finding is unknown, since the consulting physician who recommended denial of plaintiff's disability claim never examined plaintiff. The Secretary's doctor did find that the symptoms described by plaintiff were attributable to a medically determinable impairment. Tr. 174.

Plaintiff's insured status for Title II benefits expired on December 31, 1989. Tr. 29. On March 7, 1990, plaintiff sought reconsideration of the Secretary's decision denying her benefits. The following month, plaintiff was hospitalized after taking an "accidental overdose" of Xanax combined with alcohol. Tr. 295. Plaintiff admitted to being very upset and taking an overdose to "calm her

nerves", but denied suicidal ideation. Tr. 295.

On September 27, 1990, the Secretary affirmed the decision denying plaintiff's claim for benefits.[5] Plaintiff requested a hearing. In the "pre-hearing questionnaire" dated October 25, 1990, plaintiff noted she was suffering psychological problems, which she attributed to her back injury.[6] Plaintiff also said she was incapable of doing most of her house work, or even pulling up her own pants. Tr. 216.

In November, 1990, plaintiff asked Dr. Stites, who had treated plaintiff's back problems before her spinal fusion surgery, to furnish SSA with a report evaluating her condition. Tr. 299–300, 363. Dr. Stites examined plaintiff, took new X-rays, and reviewed his records and those of Dr. Herz.[7] Dr. Stites concluded plaintiff was suffering from chronic low back symptoms, status post L5–S1 fusion for spondylolisthesis, now with anterior disc abnormalities causing nerve root[8] irritation. Tr. 364. Dr. Stites advised SSA that plaintiff was severely incapacitated, incapable of performing even the full range of sedentary work, and "certainly" qualifies for disability benefits at this time. *Id.* His report also discussed the prospects for additional surgery, in the form of an anterior interbody fusion. *Id.* Dr. Stites prepared an RFC stating that plaintiff could walk/stand no more than 2 hours in an 8–hour workday, and could sit for no more than 2 hours in an 8–hour workday. Tr. 299.

On July 24, 1991, the ALJ vacated the prior nondisability determination and directed reconsideration of new evidence regarding plaintiff's psychological problems. In response to an SSA questionnaire, plaintiff indicated she was now being treated with Prozac for depression. Tr. 334–35. Plaintiff also described herself as "undisirable (sic) and useless"; "ugly"; "suffacating (sic)";

---

**5.** The notice of denial listed several additional reports that had been considered during reconsideration, including Dr. Heilman's report.

**6.** Among other things, plaintiff stated she was unable to sleep, confused, could not think straight, unable to concentrate, felt worthless, ugly, had no friends, was in constant pain, questioned whether life was worth living any more,

and thought she "might as well die!" Tr. 213, 215, 217.

**7.** Dr. Herz routinely sent copies of his notes on plaintiff to Dr. Stites. Tr. 358–62.

**8.** The report states that plaintiff has "nerve rot irritation." Tr. 364. That is obviously a typographical error.

afraid of doctors; and reluctant to be around people, have visitors, or leave her house. Tr. 337. On re-reconsideration, the Secretary again denied benefits. Tr. 323–24. The Secretary found that plaintiff's back injury did not preclude her from returning to her past relevant work as a keno runner.[9]

In August, 1991, plaintiff was examined by physicians at the Orthopedic & Fracture Clinic in Eugene, Oregon. Based on a CT scan and other diagnostic tests, they concluded she was probably suffering from chronic arachnoiditis and radiculitis[10], and there was less than a 50 percent chance that surgery would result in any significant improvement. Tr. 365–68.

In August, 1991, plaintiff was referred to a psychiatrist, Dr. George Kjaer, for treatment of depression. Tr. 344–45. Dr. Kjaer noted her depression "takes on a rather unconventional form" that "suggest[s] the attempt to develop further forensic points rather than classic depression." Tr. 345. Dr. Kjaer also noted that "almost every potential critical item [on the MMPI–2 test] has been identified by this patient." Tr. 347. Dr. Kjaer was nonetheless convinced that plaintiff was indeed mentally ill, albeit not in the manner she had presented. Rather, after extensive psychological testing, Dr. Kjaer diagnosed plaintiff as suffering from severe chronic neurosis, probably of the anxiety disorder or dysthmic disorder in a schizoid personality. Tr. 347. Dr. Kjaer also noted evidence of post traumatic stress disorder and depression. There were some indications of schizophrenia, though Dr. Kjaer believed those symptoms were more likely explained by plaintiff's history of mental retardation and social inadequacy. Id. Other symptoms noted by Dr. Kjaer included fear of doctors, substantial somatic preoccupation, hypochondriasis, fear of pain, anxiety, agoraphobia, and hopelessness. Tr. 347–48.

Dr. Kjaer estimated her "current level of adjustment" at about 70. Tr. 348. He felt plaintiff was able to maintain a semblance of family life without grossly psychotic symptomology. Id. He was pessimistic about plaintiff's future prospects, and thought she showed a relatively low prognosis for treatment by psychological methods. Tr. 347. He recommended maintaining plaintiff on relatively high doses of antidepressant medication, along with a small amount of antipsychotic medication to reduce her schizophrenic-like symptoms and mild paranoia. Tr. 348–49. Dr. Kjaer concluded that from a social security standpoint, plaintiff was "clearly disabled over a long period of time."

On November 7, 1991, plaintiff began a part-time job as a hostess in a restaurant. Tr. 338. She resigned two months later, citing constant pain. Tr. 22, 338. The Secretary deemed this an unsuccessful attempt at work. Tr. 22. A disability hearing was held on March 3, 1992, and a decision was rendered on July 15, 1992.

## THE ALJ'S DECISION

The ALJ found plaintiff had not engaged in substantial gainful activity since August 24, 1985, and that her insured status for Title II disability purposes expired on December 31, 1989. Tr. 29. The ALJ also found that the medical evidence established that plaintiff has severe impairments, but she did not have an impairment, or combination of impairments, listed in or equal to one listed in Subpart P. Id. The ALJ found plaintiff's subjective complaints including pain not credible. Id. The ALJ discounted the opinions of Drs. Heilman, Stites, and Kjaer, each of whom had opined plaintiff was disabled, and found plaintiff was capable of performing her past relevant work as a receptionist. Id. The ALJ also found plaintiff capable of working as a clerk or food checker. Tr. 30. Finally, the ALJ found that plaintiff had not been under a "disability," as defined in the Social Security Act, at any time from August 24, 1985 through July 15, 1992, the date of his decision. Id.

9. The Secretary did not disclose how many job openings there were for keno runners in the states of California and Oregon, where plaintiff resided during the relevant time period.

10. Arachnoiditis is an inflammation of the delicate membrane covering the spinal cord. *Dorland's Medical Dictionary* at 105. Radiculitis is an inflammation of the root of a spinal nerve. *Id.* at 1108.

## STANDARD OF REVIEW

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir.1991). The claimant bears the burden of proving disability. *Swenson v. Sullivan,* 876 F.2d 683, 687 (9th Cir.1989). First, the Secretary determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two the Secretary determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140–41, 107 S.Ct. at 2291; *see* §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three the Secretary determines whether the impairment meets or equals "one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." *Id.; see* 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Secretary proceeds to step four. *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291.

In step four the Secretary determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can work, she is not disabled. If she cannot perform past relevant work, the burden shifts to the Secretary. In step five, the Secretary must establish that the claimant can perform other work. *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. at 2291–92; *see* 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Secretary meets her burden and proves the claimant can perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Secretary's denial of disability insurance benefits only when the Secretary's findings are based on legal error or are not supported by substantial evidence in the record as a whole. *Baxter,* 923 F.2d at 1394. Substantial evidence is "more than a mere scintilla" but "less than a preponderance." *Id.* It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

## DISCUSSION

### 1. *Reopening the Original Determination:*

Plaintiff contends the notice denying her first claim was defective because it did not properly advise her of the consequences of not appealing the original determination. *See Gonzalez v. Sullivan,* 914 F.2d 1197, 1203 (9th Cir.1990). In response to *Gonzalez,* the Secretary promulgated an acquiescence ruling which effectively reopens those claims where (1) the claimant received a notice "like that received by Mr. Gonzalez," (2) the claimant filed a subsequent application, and (3) the claimant requests some or all the benefits claimed in the prior application. *See* AR 92–7(9) Unempl.Ins.Rep. (CCH) (New Matters) ¶ 16,879A. The Secretary has all but conceded that AR 92–7(9) applies in this case, and has considered plaintiff's application for benefits as dating from March 17, 1986. I agree.

### 2. *Ability to Perform Past Relevant Work:*

The Secretary found that plaintiff could perform her past relevant work or other work that exists in the national economy. Tr. 29–30. In reaching that conclusion, the Secretary rejected the opinions of three examining physicians who advised SSA that plaintiff had substantial mental and/or physical restrictions that rendered her disabled for Social Security purposes. The Secretary relied instead upon the findings of the Secretary's own non-examining physicians.

#### a. *Dr. Stites:*

■ The Secretary rejected Dr. Stites' opinion on grounds it was based entirely upon the claimant's "misrepresentations", and because Dr. Stites' findings allegedly conflicted with Dr. Heilman's findings. Tr.

24–25. At the outset, there is a question as to the weight to be given Dr. Stites' opinion. Plaintiff contends Dr. Stites is a treating physician, and his opinion is thus entitled to special weight. *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir.1989). The Secretary disagrees.

A treating source is defined as a physician or psychologist who has provided the claimant with medical treatment or evaluation and either has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. Dr. Stites was undeniably plaintiff's treating physician from September 11, 1985 through August of 1986, when the decision was made to perform a spinal fusion. Tr. 22–28, 230–31, 241–43. Thereafter, plaintiff's primary care physician was Dr. Herz. The record does not reflect any further direct interaction between plaintiff and Dr. Stites until November, 1990, when she asked him to provide SSA with a report on her condition. Tr. 363. However, the record shows that during this time Dr. Herz continued to send Dr. Stites copies of all medical records on plaintiff. Tr. 357–363. Thus Dr. Stites was kept informed of her condition and retained some responsibility for her care.

■ It is not necessary, or even practical, to draw a bright line distinguishing a treating physician from a non-treating physician. Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact. For instance, the opinion of a doctor who has examined the patient will ordinarily be entitled to greater weight than the opinion of a non-examining physician whose only knowledge of the patient is obtained from written reports. 20 C.F.R. § 404.-1527(d)(1). Similarly, the opinion of a physician who has treated the patient for an extended period of time is usually entitled to greater weight than a physician who has only examined the patient for SSA purposes, because the treating physician is employed to cure, and also has a greater opportunity to

know and observe the patient over the course of time. *Rodriguez v. Bowen,* 876 F.2d 759, 761 (9th Cir.1989). *See also* 20 C.F.R. § 404.1527(d)(2).

Dr. Stites falls somewhere between the two extremes. His opinion is clearly entitled to more weight than that of an ordinary examining physician, because Dr. Stites had the opportunity to observe plaintiff over an extended period of time. On the other hand, Dr. Stites had not personally examined plaintiff in several years, and was no longer employed to cure.

■ In the end, the distinction is somewhat academic because the ALJ's reasons for rejecting Dr. Stites' opinion cannot withstand any level of scrutiny. The ALJ erroneously assumed that Dr. Stites, an experienced orthopedic surgeon, found plaintiff disabled solely on the basis of her subjective (and allegedly false) complaints. Tr. 24–25. In actuality, Dr. Stites' report reveals he was fully apprised of the various medical tests Dr. Herz had performed on plaintiff and Dr. Herz's most recent assessment of plaintiff's condition. Tr. 363. Dr. Stites also took new X-rays and performed various diagnostic tests. *Id.* Finally, Dr. Stites had previously treated plaintiff for this condition. After considering the entire record, based on his knowledge of this patient over a period of years as well as her present test results and subjective complaints, Dr. Stites unequivocally found plaintiff was unable to perform even the full range of sedentary work. Tr. 364. Dr. Stites' opinion was not a mere recitation of the plaintiff's complaints, unsupported by clinical findings. *Cf. Fair,* 885 F.2d at 605; *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989).

The ALJ further discounted Dr. Stites' opinion because it allegedly conflicted with Dr. Heilman's opinion. That finding is puzzling, since the ALJ found Dr. Heilman's opinion untrustworthy as well. Tr. 24, 27. In any event, any conflict is overstated.[11]

11. RFC forms include a list of various physical functions such as reaching, handling, feeling, etc. The doctor completing the form is asked whether these functions are affected by the patient's impairment. In completing the RFC on November 9, 1990, Dr. Stites checked the "yes" box next to

the function "Pushing/Pulling". Tr. 300. The previous year, Dr. Heilman had completed an RFC form in which he stated that plaintiff's "push and/or pull" capacity was "unlimited, other than as shown for lift and/or carry." *Id.* Dr. Heilman had found that plaintiff's "lift and/or

The ALJ erred by rejecting Dr. Stites' opinion.

b. *Dr. Heilman:*

■ The Secretary gave three reasons for rejecting Dr. Heilman's findings. First, the ALJ asserted there were conflicts between the findings of Dr. Stites and Dr. Heilman that rendered both reports unreliable. Tr. 25. I have already determined those alleged discrepancies were inconsequential.

Next, the ALJ discounted Dr. Heilman's findings because the examination was procured by plaintiff, rather than the Secretary, and the purpose of the examination was to determine whether plaintiff met the criteria for Title II benefits. *Id.* The Secretary's reasoning is faulty. The claimant bears the burden of proving disability. *Swenson,* 876 F.2d at 687. Plaintiff had both a right, and the duty, to solicit a medical examination and opinion to corroborate her claim for benefits. 20 C.F.R. § 404.1513. Dr. Heilman's findings are no less trustworthy because the examination was procured by the plaintiff rather than the Secretary.

■ The Secretary also erred by asserting that Dr. Heilman's opinion was undoubtedly tainted by his knowledge that plaintiff was applying for benefits. The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits. *Rodriguez,* 876 F.2d at 761–62 n. 6.[12] The Secretary may introduce evidence of actual improprieties, but there is no evidence of that here.

Finally, the Secretary rejected Dr. Heilman's findings because they were based upon plaintiff's subjective complaints, which the

carry" capacity was quite restricted. *Id.* The ALJ relied on this alleged discrepancy to discount the medical opinions of both Dr. Stites and Dr. Heilman. Given the differences in wording of the questions and answer choices in the two forms, it is far from certain that there even is a discrepancy. Moreover, Dr. Stites' examination was performed almost a year later than Dr. Heilman's examination, during which time plaintiff's condition reportedly worsened. Finally, plaintiff's push/pull capacity has never been an important issue in this case, and neither doctor had reason to pay much attention to that particular function. Any discrepancy has little bearing on the credibility of these reports.

ALJ found not credible. The matter of plaintiff's credibility is addressed elsewhere in this opinion

c. *Dr. Kjaer:*

■ Plaintiff's psychiatrist, Dr. George Kjaer, advised SSA that plaintiff was "clearly disabled over a long period of time." Tr. 349. That opinion was based upon extensive psychological testing conducted during several office visits. Tr. 344. The ALJ rejected Dr. Kjaer's conclusion, choosing to rely instead upon the findings of Dr. Isabelle Moser, a non-examining psychologist appointed by SSA. Tr. 89.

■ Dr. Moser testified there was no evidence plaintiff had a severe mental disorder prior to the expiration of her insured status on December 31, 1989. Tr. 90. Dr. Moser's opinion appears to be based on the fact that plaintiff received little intensive psychiatric treatment before 1990. Tr. 94. That analysis assumes persons with mental illnesses promptly obtain psychiatric care, which is a dubious proposition. If plaintiff was diagnosed with a serious mental disorder in 1991, the date of onset was almost certainly sometime earlier. Progressive mental impairments do not arise full grown on the day the patient sees the doctor. *McAdams v. Secretary of HHS,* 726 F.Supp. 579, 587 (D.N.J.1989). For social security purposes, the critical date is the date of onset of disability, not the date of diagnosis. *Id.,* citing *Swanson v. Secretary of HHS,* 763 F.2d 1061, 1065 (9th Cir.1985). There is ample evidence plaintiff was suffering emotional problems long before her condition was actually diagnosed by Dr. Kjaer.[13]

12. If the Secretary believes doctors routinely lie to help their patients collect benefits, then the Secretary's doctors are also unworthy of belief because they presumably would lie in an effort to aid their client deny benefits.

13. As early as October, 1985 plaintiff was complaining of depression, insomnia, and hyperactivity. Tr. 223. In January, 1987, an MRI had to be terminated because plaintiff suffered an acute claustrophobic episode. Tr. 359. During much of 1988 plaintiff was apparently under the care of psychologist Dr. Phillip W. Middleton, who was treating her for psychological problems, including recurrent nightmares, sleep distur-

■ Plaintiff's mental disorder is relevant to a disability determination even if the disorder was by itself not sufficient to render her disabled prior to December 31, 1989. A combination of impairments may result in a finding of disability even where no single impairment taken alone would result in such a finding. 20 C.F.R. § 404.1523. Moreover, while two separate disability causes ordinarily cannot be tacked to equal 12 months, 20 C.F.R. § 404.1522(a), a different rule applies where the first disability is related to the second. Where an emerging mental impairment overlaps in time with a triggering but diminishing physical impairment, the combined effect of the impairments should be considered to the extent it might bear on the onset date of disability. *Lichter v. Bowen*, 814 F.2d 430, 436 (7th Cir.1987). Finally, even if the two conditions are unrelated, the impairments may combine to created a continuous period of disability so long as the duration of each impairment, taken separately, lasted or was expected to last for 12 months, and the initial onset of disability was before the insured status date.

■ The ALJ not only found that plaintiff was not disabled prior to December 31, 1989, but that she was not disabled "at any time through the date of this decision," i.e., July 15, 1992. Tr. 30. This finding is not supported by Dr. Moser's testimony, since her conclusions were expressly limited to plaintiff's mental condition during the time period ending in December of 1989. Tr. 90–94. Nor is there an adequate basis for that conclusion in light of Dr. Kjaer's uncontroverted statements to the contrary.

The ALJ rejected Dr. Kjaer's opinion on grounds it was internally inconsistent because Dr. Kjaer had estimated plaintiff's "level of adjustment" at about 70. Tr. 25. The ALJ speculated that Dr. Kjaer was probably referring to an index known as a "Global Assessment of Functioning ... in

which a score of 70 would represent only mild symptoms." Tr. 25. However, there was no testimony on this point from any mental health professional. Dr. Moser's testimony did not discuss plaintiff's GAF score (if that was in fact what Dr. Kjaer was describing), the significance of a given rating, or whether that rating would be inconsistent with Dr. Kjaer's overall findings. Nor did the ALJ ask Dr. Kjaer to explain this part of his findings. The record does not disclose an adequate basis for the ALJ to make his own medical findings on this issue. *See Gonzalez–Perez v. Secretary*, 812 F.2d 747, 749 (1st Cir.1987) (ALJ lacked expertise to reject a physician's opinion); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) (ALJ's independent review and interpretation of laboratory reports was an impermissible substitution of ALJ's own judgment for that of a physician).

On these facts, the Secretary erred by rejecting the findings of an examining psychiatrist in favor of a non-examining psychologist. The Secretary also erred by finding plaintiff was not under a disability from January 1, 1990 through July 15, 1992 when there was insufficient evidence to support that finding and it was contradicted by the opinion of an examining psychiatrist.

### d. *Credibility:*

The Secretary's findings rely heavily on a determination that plaintiff's subjective complaints were not credible. On that basis, the Secretary discounted not only plaintiff's subjective complaints but also the opinions of all her doctors, whose opinions were said to have been tainted by plaintiff's misrepresentations.

■ Once a claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully

---

bances, marital difficulties, and fear of medical treatment. Tr. 344. The record also shows that in January, 1989, Dr. Englesby prescribed Xanax for plaintiff's anxiety. Tr. 269. In April, 1989, plaintiff was hospitalized after complaining of chest pain that left her tense, apprehensive, lightheaded, and short of breath. Tr. 270. A medical examination disclosed no apparent physical

cause for those complaints. Tr. 270–72. In April, 1990, plaintiff was hospitalized after ingesting an "accidental" overdose of alcohol and pills in an effort to "calm her nerves." Tr. 295. Plaintiff's self-descriptions in October, 1990 and August, 1991 also suggest the need for psychiatric intervention. Tr. 213, 215, 217, 337.

corroborate the alleged severity of pain. *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991) (en banc). Though the adjudicator may still find the allegations of severity not credible, the adjudicator must make specific findings which support this conclusion. *Id.* In this case, the Secretary's own medical experts not only found there was *some* objective evidence of an underlying impairment that could cause the reported symptoms, but have repeatedly found that plaintiff's subjective complaints were "attributable ... to a medically determinable impairment." Tr. 174, 187, 319. The ALJ nonetheless found plaintiff's subjective complaints not credible.

■■■ The ALJ found that plaintiff's subjective complaints to Dr. Heilman and Dr. Stites were impeached by her statements in Exhibit 43. Specifically, the ALJ cites Exhibit 43 as proof plaintiff was able to lead "an active lifestyle." Tr. 24. In fact, Exhibit 43 states that in July, 1989, plaintiff reported being unable to walk for more than one block before needing rest; unable to stand in one spot for more than 20 minutes; unable to comfortably lift a bag of groceries; had considerable difficulty with bending, twisting, stooping, squatting, driving, or even sitting. Tr. 275–77. Her "active lifestyle" consisted of checking the mail, visiting with her daughter, washing, ironing, preparing dinner, and watching television. Tr. 277. Even this modest regimen required her to lie down to rest several times a day. *Id.* It is difficult to see how these limited tasks could be construed as an "active lifestyle" for a 42–year old woman. A claimant need not be totally incapacitated to be found unable to engage in

substantial gainful activity. *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987). Evidence that a claimant can assist in housework may be considered in determining plaintiff's ability to perform substantial gainful activity. *Id. See also Bunnell,* 947 F.2d at 346. However, the ability to perform some household chores is not necessarily incompatible with an application for disability benefits. *Cooper,* 815 F.2d at 561. The limited range of household activities described by plaintiff could hardly be deemed conclusive evidence that she is capable of consistently working an 8–hour day in the competitive world of an unsheltered workplace, nor are those household activities inconsistent with plaintiff's description of her physical limitations.

■■■ The ALJ further erred by finding that the "active lifestyle" described by plaintiff in exhibit 43 contradicted her testimony at the hearing. A review of the record reveals no significant discrepancies.[14] The ALJ also found inconsistencies between the symptoms plaintiff related to Dr. Stites and the symptoms she recounted in Exhibit 43. I respectfully disagree.[15]

■■■ The ALJ further discounted both plaintiff's subjective complaints and the corroborating testimony of her husband because of her "clear secondary gain motivation," i.e. she was applying for disability benefits. Tr. 24. That was erroneous. By definition, every claimant who applies for Title II benefits does so with the knowledge—and intent—of pecuniary gain. That is the very purpose of applying for Title II benefits. The same

---

**14.** Plaintiff testified that in a typical day she gets up in the morning, has a cup of coffee with her husband before he goes to work, and then returns to bed. Tr. 66–67. She later gets up, gets dressed, and tries to clean herself up. Tr. 67. She then feeds the dog and takes the dog for a very short walk. *Id.* Later, she fixes something to eat, takes her medicine, and by 10:00 has to lay down for an hour or two because her back is hurting. Tr. 67–68. She then tries to do the dishes, write a few letters, and then lays down for her 2:00 nap. Tr. 68–69. Two or three times a week she fixes dinner. Tr. 69. She cannot vacuum or sweep, but sometimes she dusts, makes beds, and does some laundry. Tr. 75. She has trouble dressing herself. Tr. 76. That is not inconsistent with the activities plaintiff described in Exhibit 43 three years earlier.

**15.** Dr. Stites estimated plaintiff could lift no more than 9 pounds. Tr. 299. In Exhibit 43, plaintiff estimated she could lift between 8 and 12 pounds. Tr. 276. The difference is of little import. A lay witness can hardly be expected to know precisely how many pounds she is capable of lifting. Rather, a lay person would be expected to estimate weight by known objects, e.g. a gallon of milk, or a bag of groceries. Minor discrepancies in such estimates are foreseeable. Dr. Heilman's estimate that plaintiff could carry up to 5 pounds for "not more than 15 minutes" is also not inconsistent with other estimates which lacked a temporal component. Tr. 292.

motivation afflicts every applicant for workers compensation benefits, and every personal injury plaintiff. If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible.

The ALJ failed to mention the one piece of evidence that raised the most doubt as to plaintiff's credibility. Dr. Kjaer's report suggested plaintiff may have exaggerated her depression somewhat in an "attempt to develop further forensic points." Tr. 345. Dr. Kjaer's findings raise some concern about plaintiff's credibility. However, that single act of deception, during a time when plaintiff was mentally ill, appears to be an aberration when viewed in context of the record as a whole. Plaintiff voluntarily underwent spinal fusion surgery in an effort to alleviate the pain in her back. She had needles inserted in her spinal column in an effort to diagnose the source of her continued pain. She offered to undergo additional spinal surgery if the doctors believed it would restore her health. It is inconceivable that plaintiff would endure these invasive procedures unless she was actually suffering from a debilitating back injury.

Plaintiff's conduct after the surgery is also inconsistent with the profile of a malingerer. Dr. Herz's notes indicate plaintiff was very frustrated by the slow pace of her recovery. Tr. 359. On several occasions plaintiff reinjured her back by attempting to perform tasks beyond her physical limitations. Plaintiff volunteered to participate in a vocational assessment program in Sacramento. The program counselors report plaintiff appeared to give it her best effort, but was unable to complete the program. Tr. 286. Plaintiff

was reportedly in considerable pain, yet persisted in trying to complete the program until the counselors finally deemed it necessary to bar her from further participation. Tr. 286–91. It is noteworthy that plaintiff insisted on reimbursing her insurance carrier for the unused portion of the expense money advanced to her for the trip to Sacramento. Tr. 286. That act is inconsistent with the ALJ's portrait of plaintiff as a malingerer who is lying about her medical condition for financial gain. Plaintiff also acted against her pecuniary interests by attempting a return to work as a part-time restaurant hostess in November, 1991, while her disability claim was on appeal. Plaintiff did not quit after the first day, but remained on the job for nearly two months before resigning due to "constant pain."[16] Tr. 338.

In summary, the record as a whole paints a portrait of a hard-working woman of limited education who abruptly ceased work and became a virtual recluse after suffering a back injury in 1985. It is not the portrait of a malingerer.

e. *Vocational Expert:*

The ALJ asked the vocational expert to assume plaintiff was capable of working an eight-hour day, but would need to lie down on her regularly-scheduled breaks. Tr. 98. The VE testified that given those constraints, plaintiff could return to her past relevant work as a receptionist. Tr. 99. Implicit in that conclusion is the assumption that a cot will be available for the receptionist to use during her breaks. However, the VE provided no estimate of the number of businesses that could actually accommodate plaintiff's special needs.

---

16. On appeal, the Secretary suggests the very fact that plaintiff would even attempt to work as a part-time hostess/cashier in a restaurant given the nature of her alleged disabilities is proof she is not actually disabled. Defendant's Memorandum at 23. The Secretary apparently assumes that plaintiff had her choice of employment opportunities and could have selected a less demanding job had she been so inclined. The Secretary offers no proof that such job openings actually existed in economically-depressed timber communities such as Mapleton, Oregon, where plaintiff was residing, or that plaintiff would have actually been chosen for such a job, given her limited skills and education and history of physical and mental impairments. The most likely explanation for plaintiff's behavior is that after being out of work for more than six years, her worker's compensation benefits long since exhausted and little prospects for obtaining disability benefits in the near future, economic necessity dictated she accept any employment opportunity that became available. Moreover, the job was only part-time, four hours a day. Indeed, had plaintiff declined this job opportunity, the Secretary would likely have cited that as proof plaintiff was not interested in even attempting a return to work.

Also implicit in the ALJ's question is the assumption that plaintiff could in fact work a normal eight-hour day. The VE's conclusions are meaningless if they are based upon a hypothetical that does not accurately reflect the plaintiff's physical and mental restrictions. *Embrey v. Bowen,* 849 F.2d 418, 422–23 (9th Cir.1988). Dr. Heilman's report indicated that plaintiff was unable to work an eight-hour day with normal breaks. Tr. 292. Dr. Stites' report came to the same conclusion. Tr. 299. The VE conceded that if plaintiff had to rest for any significant periods of time other than regularly-scheduled breaks, she would be unable to perform either her past relevant work or any other job in the national economy. Tr. 103, 109. Accordingly, if the reports of Dr. Heilman or Dr. Stites are credible, then plaintiff is disabled as a matter of law. 20 C.F.R. § 404.-1520(f).

■ The ALJ sought to avoid this result by suggesting that an "eight-hour day" does not actually require the ability to perform eight hours of work, but only six-and-a-half to seven hours. Tr. 110–11. That was erroneous. While there are some employers who give their employees eight hours of pay for only six-and-a-half hours of work, countless other employers do not provide paid lunch breaks, in which case an "eight" hour day may in fact require the worker to sit or stand for at least nine hours. Moreover, once the ALJ deviated from the assumption of an eight-hour day and began to consider the actual number of hours worked, he should have limited the pool of available jobs to those employers who require just six-and-a-half hours of work for eight hours of pay and also never require a receptionist to work overtime. Finally, the RFC form completed by Dr. Heilman already took normal breaks into account in determining how many hours plaintiff could work. Tr. 292. By deviating from a normal eight-hour day to include breaks which had already been considered by plaintiff's physician, the ALJ effectively double-counted those breaks.

■ On appeal, the Secretary contends that the error is inconsequential because plaintiff is not disabled if the Secretary finds she is capable of working part-time, citing *Davis v. Secretary of HHS,* 915 F.2d 186, 189 (6th Cir.1990). There is some logic to the Secretary's argument. A claimant who is presently performing substantial gainful activity is presumptively not disabled. 20 C.F.R. § 404.1520. Part-time work that results in average earnings in excess of $500 per month will ordinarily constitute substantial gainful activity that precludes a finding of disability. 20 C.F.R. § 404.1574; *Katz v. Secretary of HHS,* 972 F.2d 290 (9th Cir. 1992). Logically, the same standard ought to apply to a claimant's ability to obtain future work, i.e. if the claimant is not presently engaging in substantial gainful activity, but has the potential to do so in the future, then she is not disabled.

■ However, that is not the way the Secretary has historically interpreted the regulations. Rather, in assessing a claimant who is not presently engaged in substantial gainful activity, the Secretary has always asked whether the claimant is capable of working an eight-hour day. Thus Social Security Ruling 83–10 defines "sedentary", "light", and other forms of work in terms of the number of hours of sitting and standing that are required in an eight hour workday. Social Security Ruling 83–10, Unempl.Ins.Rep. (CCH) (New Matters) ¶ 14,-531.[17] Similarly, RFC forms are primarily directed at determining whether the claimant is capable of working an eight hour day.[18]

The Ninth Circuit has always assumed that where a claimant is not presently engaged in substantial gainful activity, the burden is on the Secretary to demonstrate that the claimant is capable of working an eight-hour day

---

**17.** While lacking the force of law, Social Security rulings constitute the Social Security Administration's official interpretations of the statute it administers and of its own regulations, and are binding on ALJ's. *Terry v. Sullivan,* 903 F.2d 1273, 1275 n. 1 (9th Cir.1990).

**18.** *See, e.g.,* Tr. 121, 135, 299. It is noteworthy that the RFC forms in the record typically do not ask the precise number of hours the claimant is capable of performing an activity, but rather whether those hours total eight, e.g. is the claimant capable of sitting for at least six hours and standing/walking for at least two hours? Tr. 170, 183, 292.

at some other job that exists in sufficient numbers in the national economy. *Rodriguez*, 876 F.2d at 762 (claimant who could only work four hours a day was presumptively disabled.) Other courts have reached the same conclusion, without first assessing whether the claimant could potentially earn $500 a month while working part-time. *See, e.g., Cavitt v. Schweiker*, 704 F.2d 1193, 1194–95 (10th Cir.1983) (claimant able to sit two hours and stand one hour was presumptively disabled); *Johnson v. Harris*, 612 F.2d 993, 998 (5th Cir.1980) (claimant only able to work four hours per day was disabled); *Harris v. Sullivan*, 770 F.Supp. 935, 940 (D.Del. 1991) (claimant who could not sit/stand for total of 8 hours was presumptively disabled, since SSR 83–10 assumes a claimant must be able to work an 8 hour day).

It is uncertain why the Secretary first created this distinction between present substantial gainful activity and potential substantial gainful activity. Nonetheless, the Secretary's regulations and practices have long recognized such a distinction. The eight-hour day standard has been employed in thousands of other disability cases. It is too late for the Secretary to deny this interpretation of her regulations. That is not to say the Secretary could not promulgate new interpretive regulations that abolish this distinction. I hold only that fundamental considerations of fairness require the Secretary to consistently interpret and apply her regulations. Plaintiff is entitled to have her claim evaluated on the same basis as other claimants in this circuit.

3. *The Secretary's Decision Should be Reversed:*

 The decision whether to remand a case for additional evidence or simply award benefits is within the discretion of the court. *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985). The court generally awards benefits when no useful purpose would be served by further administrative proceedings, or when the record has been fully developed and there is not sufficient evidence

to support the ALJ's conclusion. *Rodriguez*, 876 F.2d at 763; *Varney v. Secretary of HHS*, 859 F.2d 1396 (9th Cir.1988). This is such a case. Plaintiff's application for Title II benefits has been pending for seven years. During that time the Secretary has consistently failed to advance a supportable reason for denying benefits.[19] The ALJ's latest findings are not supported by substantial evidence in the record, and passage of time makes it improbable that further medical evidence could be obtained that would shed light on plaintiff's condition between August 24, 1984 and December 31, 1989.

When plaintiff's back injury first manifested itself on August 24, 1985, it was not immediately apparent that the injury would result in long-term disability. However, plaintiff's condition steadily deteriorated until she was obliged to undergo spinal fusion surgery in August, 1986. By the time plaintiff began to recover from that operation, it had already been more than twelve months since she had last been capable of engaging in substantial gainful activity. Accordingly, I find that plaintiff met the durational requirement of 20 C.F.R. § 404.1509 and was eligible for Title II benefits commencing with her application date of March 17, 1986.

Plaintiff's medical condition following the surgery has been unstable, with a general downward trend punctuated by brief periods of improvement. The record does not show there has been any continuous period of time since the operation during which plaintiff was capable of returning to full-time employment at either her prior relevant work or any other job that exists in sufficient numbers in the national economy. In 1989, plaintiff attempted to complete a vocational assessment program. In 1991, plaintiff attempted to return to part-time work. Both attempts were unsuccessful.

None of plaintiff's doctors are optimistic about the prospects for her recovery. Dr. Stites described plaintiff as "severely incapacitated." Tr. 364. Dr. Kjaer described plaintiff as "clearly disabled over a long period of time," Tr. 349, and was pessimistic

---

19. For instance, the Secretary found that plaintiff, a resident of Oregon who had difficulty walking or standing for any length of time, was not disabled because she could work as a keno runner. Tr. 324.

about her prospects for future improvement. Tr. 347. Likewise, Dr. Matteri estimated there was less than a 50% change plaintiff would obtain any significant improvement through surgical intervention. Tr. 367.

There may be some question as to the extent to which plaintiff's disability is attributable to her physical problems, and how much is psychological in nature. Whatever the reason for her illness, plaintiff has effectively been disabled since August, 1985. At least three doctors have opined that plaintiff is disabled for either physical or mental reasons. While Dr. Heilman's opinion may be partly discounted because of his lack of familiarity with plaintiff and the lack of clinical findings, the same cannot be said for Dr. Stites and Dr. Kjaer. The Secretary chose to rely instead upon the opinions of non-examining doctors, the unsupported medical findings of an ALJ, non-existent discrepancies in the record, unsubstantiated credibility findings, and an underlying belief that neither the claimant, nor her husband, nor any of her doctors were trustworthy because they each had an interest in seeing that plaintiff was found eligible for benefits. This does not rise to the level of substantial evidence required to sustain the Secretary's decision. The Secretary also misapplied the regulations in finding that plaintiff could work an "eight-hour day" even if she could not actually work eight hours, in assuming she could lay down at work when there was no testimony to support that premise, and by ignoring plaintiff's physical limitations when presenting hypotheticals to the vocational expert.

It is time for this case to come to a close. Prolonging these proceedings further will not benefit any of the parties involved. I find that the Secretary's decision is not supported by substantial evidence. I further find that during the period from August 24, 1985 through the hearing date of March 3, 1992, plaintiff did not perform substantial gainful activity nor was she capable of returning to her past relevant work or performing other work available in sufficient numbers in the national economy. I also find that plaintiff's eligibility for benefits commenced with her initial application on March 17, 1986, and is not barred by res judicata. Accordingly,

plaintiff is entitled to receive disability benefits for the period of March 17, 1986, through March 3, 1992. I express no opinion as to plaintiff's condition subsequent to March 3, 1992.

## CONCLUSION

The decision of the Secretary should be reversed and remanded for a determination of benefits.

DATED this 24 day of June, 1993.