Sharon RICHARDSON o/b/o C.R.,
a minor child, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. CIV.A.H–02–4621.

United States District Court,
S.D. Texas,
Houston Division.

March 25, 2004.

---

James Foster Andrews, Attorney at Law, Houston, TX, for Sharon Richardson, as next friend of Cal Richardson, Plaintiff.

Angeline Johnson, OGC/SSA, Dallas, TX, for Jo Anne Barnhart, Commissioner of Social Security, Defendant.

## MEMORANDUM AND ORDER

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Sharon Richardson's ("Richardson"), on behalf of her minor son, C.R.,[1] and Defendant Jo Anne B. Barnhart's ("Commissioner") cross-motions for summary judgment. Richardson appeals the determination of an Administrative Law Judge ("ALJ") that

C.R. is not entitled to receive Title XVI supplemental security income ("SSI") childhood disability benefits. *See* 42 U.S.C. § 1382c(a)(3)(C). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, this Court is of the opinion that Richardson's motion (Docket Entry No. 15) should be denied, the Commissioner's motion (Docket Entry No. 18) should be granted, and the ALJ's decision denying C.R. childhood disability benefits be affirmed.

## I. Background

On January 17, 2001, Richardson, on behalf of her minor son, C.R., filed an application for SSI benefits with the Social Security Administration ("SSA"), claiming that C.R. is disabled due to a speech impairment. (R. 84–86, 150). According to Richardson, C.R. has been disabled since his birth in 1993. (R. 84).

After C.R. was denied benefits initially and on reconsideration, Richardson requested an administrative hearing before an ALJ to review the decision. (R. 74–75). A hearing was held on April 3, 2002, in Houston, Texas, at which time the ALJ heard testimony from Richardson. (R. 22–58). In a decision dated April 12, 2002, the ALJ denied C.R. SSI childhood disability benefits. (R. 12–19). In his decision, the ALJ found that C.R. had Attention Deficit Hyperactivity Disorder ("ADHD"),[2] a

---

1. In order to promote electronic access to case files while also protecting personal privacy and other legitimate interest, certain personal data identifiers shall be omitted or redacted from pleadings filed with the Court. *See In the Matter of Protecting Personal Privacy in Public Case Files*, General Order No.2003–4 (S.D. Tex. Aug. 27, 2003) (Kazen, J.). Thus, as it relates to the case at bar, only the initials of a minor child should be used; only the last four digits of an individual's social security number should be included;

and, if an individual's date of birth must be included in a pleading, only the year should be used. *See id.*

2. "Attention Deficit Hyperactivity Disorder" or "ADHD" is a childhood mental disorder characterized by inattention (such a distractibility, forgetfulness, not finishing tasks, and not appearing to listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, diffi-

Learning Disorder,[3] and a Reading Disorder, which were severe within the meaning of 20 C.F.R. § 416.924(c). (R. 18). The ALJ determined, however, that C.R.'s impairments did not meet or medically equal one of the listed impairments in Part B of Appendix I to Subpart P, 20 C.F.R. Part 404. (R. 18).

Richardson appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 8, 195–200). The Appeals Council, on October 11, 2002, declined to review the ALJ's determination. (R. 4–5). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Richardson filed the instant action on November 22, 2002, contesting the Commissioner's denial of C.R.'s claim for benefits.

## II. Analysis

### A. Statutory Bases for Determining SSI Childhood Disability Benefits [4]

To qualify for SSI, a child must be disabled under the Social Security Act. Before 1990, a child (under age eighteen) was "disabled" if he or she suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working. *See* 42 U.S.C. § 1382c(a)(3) (1982). On February 20, 1990, the United States Supreme Court decided *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In *Zebley,* the Supreme Court invalidated regulations requiring a medical "listings-only" approach to child SSI disability claims and held that, in addition to evaluating claims based on listed impairments, the Commissioner must adopt a functional approach to child disability claims, similar to the system in place to evaluate adult claims. *See Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000)

---

culty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior. *See* DORLAND's ILLUSTRATED MEDICAL DICTIONARY 528 (29th ed.2000).

**3.** "Learning Disorder" refers to a group of disorders characterized by academic functioning that is substantially below the level expected on the basis of the patient's age, intelligence, and education, interfering with academic achievement or other functioning. Included are *reading disorder, mathematics disorder,* and *disorder of written expression. See* DORLAND's, *supra,* at 530.

**4.** In 1972, Congress overhauled the Social Security Act, producing the SSI program—an ambitious network of transfer payments to needy individuals who, for various reasons, were unable to work. *See Encarnacion ex rel. George v. Barnhart,* 331 F.3d 78, 80 (2d Cir. 2003) (citing Pub L. No. 92–603, § 301, 86 Stat. 1329, 1465 (1972)). Although the predominant focus of the legislation was benefits for adults, Congress included a provision

making disabled children eligible for SSI payments, as well. *See id.* (citing 86 Stat. at 1471). Congress has never clearly established the precise purposes of SSI for children. *See id.* at 90. The official legislative history of the 1972 Act states:

[D]isabled children who live in low-income households are certainly among the most disadvantaged of all Americans and ... they are deserving of special assistance in order to help them become self-supporting members of our society. Making it possible for disabled children to get benefits under this program, if it is to their advantage, rather than under the programs for families with children, would be appropriate because their needs are often greater than those of nondisabled children. The bill, accordingly, would include disabled children under the new program. Parents' income and resources would be taken into account ....

*See id.* (quoting H.R.Rep. No. 92–231, at 147–48, reprinted in 1972 U.S.C.C.A.N. 4989, 5133–34).

(citing *Zebley*, 493 U.S. at 530–32, 110 S.Ct. 885). After *Zebley*, the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis ("IFA"). *See Haws ex rel. Haws v. Apfel*, 61 F.Supp.2d 1266, 1272 (M.D.Fla.1999).

## 1. *Personal Responsibility and Work Opportunity Reconciliation Act of 1996*

On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRAWORA"), which amended the statutory standard for children seeking SSI benefits based on disability. *See* § 211(a) of Pub.L. 104–193, 110 Stat. 2105, 2188–89 (codified at 42 U.S.C. § 1382c(a)(3)(C)). The new standard and its accompanying regulations were more stringent than their pre-PRAWORA counterparts, requiring a greater showing from an SSI disability claimant. *See Harris*, 209 F.3d at 419 & n. 36. Under the revised standard, a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. *See* 42 U.S.C. § 1382c(a)(3)(C) (1994 & Supp. II 1996). Additionally, the PRAWORA eliminated the use of the IFA. *See* 20 C.F.R. §§ 416.924d, 416.924e (1996). The PRAWORA also removed references to "maladaptive behavior" from specified sections of the SSA's Listing of Impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* § 211(b)(1)-(2) of Pub.L. 104–193, 110 Stat. at 2189.

## 2. *Interim Final Rules*

On February 11, 1997, the SSA published interim final rules to implement the childhood disability provisions of the PRA-WORA. *See* 62 Fed.Reg. 6408. The interim final rules deleted references to the former standard of "comparable severity" and made other revisions to the rules, including those related to the elimination of the IFA and the deletion of references to "maladaptive behavior" in the specified sections of the listings. The interim final rules also defined the statutory standard of "marked and severe functional limitations" in terms of "listing-level severity." *See* 20 C.F.R. §§ 416.902, 416.906, 416.924(a) (2000). Moreover, the interim final rules established a new sequential evaluation process for determining disability for children. Under this three-step process, a child was required to show:

(1) he or she was not engaged in substantial gainful activity (*i.e.*, not working);

(2) he or she had a "severe" impairment or combination of impairments; and

(3) his or her impairment or combination of impairments was of listing-level severity, that is, the impairment(s) met, medically equaled, or functionally equaled the severity of an impairment in the listings.

*See* 20 C.F.R. § 416.924 (2000).

The interim final rules provided four methods for determining functional equivalence, the primary and most frequently used method being whether a child had marked limitations in two broad areas of functioning or an extreme limitation in one of such areas. *See* 20 C.F.R. § 416.926a(b) (2000).

## 3. *Final Rules*

On September 11, 2000, the SSA published its final rules, which became effective on January 2, 2001, for determining childhood disability. *See* 65 Fed.Reg. 54,-747, corrected by 65 Fed.Reg. 80,307. The final rules revised the interim final rules. Significantly, the final rules continue to

define the statutory standard of "marked and severe functional limitations" in terms of "listing-level severity." The final rules continue to follow the three-step sequential evaluation:

(1) whether the child is doing substantial gainful activity;

(2) if not, whether the child has a medically determinable "severe" impairment or combination of impairments; and

(3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 2. .

See 20 C.F.R. § 416.924(b)-(d) (2001 & Supp.2003); *accord Sykes v. Barnhart,* 84 Fed.Appx. 210, 213 (3d Cir.2003); *Elam ex rel. Golay v. Commissioner of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003). The final rules, however, simplify the interim final rules by replacing the four methods for determining the functional equivalence with a single method. *See* 65 Fed.Reg. at 54,755 & 54,782. Under the final rules, whether a child meets the "listing-level severity" standard is dependent on whether the child has marked limitations in two broad areas of development or functioning or extreme limitation in one of those areas. *See* 20 C.F.R. § 416.926a (2001).

Additionally, the final rules rename the broad areas of functioning into what the final rules call "domains," and incorporate features of the three methods of functional equivalence that were deleted from the final rules.[5] The final rules also add a new domain, "health and physical well-being." *See* 20 C.F.R. § 416.926a(1) (2001). Thus, under the final rules, there are six domains used to determine a child's functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *See id.* Although the final rules revise some of the methodology, the basic standard for determining functional equivalence remains the same in the final rules. Specifically, to establish functional equivalence, a child must have a medically determinable impairment or combination of impairments that results in marked limitations in two domains or an extreme limitation in one domain. *See* 20 C.F.R. § 416.926a(d) (2001).

Effective January 2, 2001, the final rules apply to claims pending at any stage of the administrative review process, including claims that are pending administrative review after remand from a federal court. *See* 65 Fed.Reg. at 54,750. The SSA explained in its preamble to the final rules, "[w]ith respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision." *See id.* at 54,750–54,751. Here, both the ALJ and the Appeals Council properly analyzed the issues in accordance with the final rules.

---

**5.** For example, a former area of functioning was entitled "concentration, persistence, or pace." *See* 20 C.F.R. § 416.926a(c)(4)(vi) (2000). Under the final rules, this domain is now entitled "attending and completing tasks" and incorporates aspects of two prior areas of functioning such as "responsiveness to stimuli" and portions of the former area "concentration, persistence, or pace." Under the domain of "attending and completing tasks," the SSA now considers how well a child is able to focus and maintain attention and how well a child begins, carries through, and finishes activities, including the pace at which the child performs such activities. *See* 20 C.F.R. § 416.926a(h) (2001).

## B. *Standard of Review*

### 1. *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo. See Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

### 2. *Administrative Determination*

■ Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999).

■ When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

## C. *ALJ's Determination*

An ALJ must engage in a three-step sequential process in evaluating whether a child is disabled and eligible for SSI benefits:

(1) whether the child is doing substantial gainful activity;

(2) if not, whether the child has a medically determinable "severe" impairment or combination of impairments; and

(3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

See 20 C.F.R. § 416.924(b)-(d); accord Sykes, 84 Fed.Appx. at 213; Elam ex rel. Golay., 348 F.3d at 125. To determine whether an impairment is functionally equivalent to a listing, the ALJ must determine that the impairment results in a marked limitation in two domains of functioning or an extreme limitation in one domain. See 20 C.F.R. § 416.926a(a); accord Phifer ex rel. Phifer v. Commissioner of Soc. Sec., 84 Fed. Appx. 189, 191 (3d Cir.2003). The domains which the ALJ is to analyze are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. See id. (citing 20 C.F.R. § 416.926a(b)(1)). A marked limitation is present where the impairment interferes seriously with one's ability to "independently initiate, sustain, or complete activities." See id. (citing 20 C.F.R. § 416.926a(e)(2)(i)). An extreme limitation is present where one's impairment "interferes very seriously with [one's] ability to independently initiate, sustain, or complete activities." See id. (citing 20 C.F.R. § 416.926a(e)(3)(i)).

In this case, the ALJ found that, although C.R. was not working and his

ADHD, Learning Disorder, and Reading Disorder were severe impairments, C.R.'s condition did not meet, medically equal, or functionally equal the severity of an impairment listed in the regulations. Accordingly, the ALJ concluded that C.R. was not disabled under the Act. (R. 18–19). This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. See Masterson, 309 F.3d at 272; Watson, 288 F.3d at 215; Myers, 238 F.3d at 619; Newton v. Apfel, 209 F.3d 448, 452 (5th Cir.2000); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir.1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); see also 42 U.S.C. §§ 405(g), 1383(c)(3). Any conflicts in the evidence are to be resolved by the ALJ and not the court. See Newton, 209 F.3d at 452; Brown, 192 F.3d at 496; Martinez v. Chater, 64 F.3d 172, 174 (5th Cir.1995); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir.1990).

## D. Issues Presented

Richardson argues that the record evidence demonstrates that C.R. has marked limitations in at least two domains and, thus, functionally equals the disability requirements Listing 112.11, pertaining to ADHD.[6] Richardson also contends that the ALJ erred by rejecting the conclusions and/or diagnoses of C.R.'s treating physicians without an adequate explanation.

## E. Review of the ALJ's Decision

### 1. Listing 112.11

Richardson argues that C.R. functionally equals Listing 112.11. Richardson claims

---

**6.** Listing 112.11 pertains to ADHD. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B)(2)(a)-(d).

that C.R. has marked and/or extreme impairments in the domains "interacting and relating to others," "attending and completing tasks," and/or "caring for himself."

■ In reaching his determination that C.R.'s combination of impairments did not functionally equal Listing 112.11, the ALJ assessed C.R.'s limitations under the six domains as follows:

In this case, the claimant is found to have a less than marked limitation in the domain of "acquiring and using information." The claimant is in special education classes for Reading and Math. However, the record does not show that the claimant has a marked limitations in this domain. Ms. Shorts indicated on the *School Activity Report* that the claimant had the superior ability to comprehend classroom discussion and remember information just heard and the above average ability to retain instruction from week to week (Exhibit [6]E). The claimant also has a less than marked limitation in the domain of "interacting and relating to others." The claimant is taking speech therapy at school due to a moderate language defect, but the record does not show that the claimant has a marked limitation in this area. The claimant is able to participate in class and successfully perform on an academic level. (See Exhibit 6E). The claimant's mother also testified that the claimant had friends with whom he played.

The claimant has a less than marked limitation in the domain of "attending and completing tasks." Although, the claimant has been diagnosed with attention deficit hyperactivity disorder (Exhibits 6F and 4F), Ms. Short provided that the claimant was "completely on task" and excelled "in all academic areas." Also, the claimant's report cards are not indicative of a person who is not paying attention. Additionally, the claimant's mother testified that the claimant is in special education classes for only Reading and Math. His report card shows that the claimant excels in Social Studies and Science. (Exhibit 8E). Moreover, the claimant does not require medication for this condition.

The claimant has no limitation in the domains of "moving about and manipulating objects" or "caring for yourself." There is no evidence to indicate that the claimant has any difficulties that would limit him in these domains. The claimant's mother testified that the claimant could dress himself when she assists. Her testimony is somewhat inconsistent with the report of Dr. Ganc, in which it was noted that the claimant could give himself a bath, select his clothes, and dress himself. (Exhibit 4F).

The claimant has no limitation in the domain of "health and physical well-being." The claimant's mother testified that the claimant's only physical problems were that [he] is small and is getting his tonsils out. These are not impairments.

Therefore, the undersigned finds the claimant to have no marked limitations in any domains. Accordingly, he does not have an impairment of functional equivalence to a listed impairment.

(R. 14–17).

Because the ALJ's findings in the domains of "acquiring and using information," "moving about and manipulating objects," and "health and physical well-being" are not challenged by Richardson, the Court will only address the ALJ's findings in the remaining three domains.

### a. *"Interacting and Relating with Others"*

The record belies Richardson's contention that C.R. has marked or extreme limi-

tations in the domain of "interacting and relating with others." Specifically, in a Function Report completed at the time C.R.'s SSI application was filed in January 2001, Richardson represented that C.R. could deliver telephone messages, repeat stories he had heard, tell jokes or riddles accurately, talk with friends and family, read simple words, and add and subtract numbers over 10. (R. 87, 90–91). Richardson further noted that C.R.'s speech impairment did not affect his behavior with other people. (R. 93). Also, in a School Activity Report dated April 26, 2001, C.R.'s teacher noted that he was "very responsive to activities in class" and was "cooperative and resourceful with his classmates." (R. 168). Richardson also testified at the hearing in April 2002, that C.R. played basketball or kickball outside almost every day with neighborhood kids. (R. 39–40). He also attended church weekly for 1 ½ hours. (R. 41–43). Thus, there was substantial evidence supporting the ALJ's finding that C.R. has "less than marked limitation" in this domain.

#### b. *"Attending and Completing Tasks"*

Similarly, the record contradicts Richardson's contention that C.R. has marked or extreme limitations in the domain of "attending and completing tasks." Although C.R. scored in January 2000, "somewhat below average" in a subset of tests in reading and mathematics on the Stanford Early School Achievement Test, the examiner noted that there were no very high or very low scores on any of the subtests. (R. 117). Additionally, aside from a moderate receptive language disorder/moderate expressive language disorder, a Speech and Language Assessment conducted by the school district on November 29, 2000, revealed that C.R.'s adaptive functioning was within the limits of personal independence and social responsibility

expected of his age and cultural group in and away from school, and that his educational performance, based on a review of educational records, observation and/or teacher interviews, was within intellectual potential and functional ability. (R. 98–99, 102). Moreover, the report concluded that, based on teacher and parent input, C.R. displayed no significant emotional or behavioral problems that would adversely affect his educational placement. (R. 99). During the individual testing process, it was noted by the examiner that C.R. exhibited "normal levels of attention, cooperation and patience." (R. 99). Further, on December 1, 2000, C.R.'s teachers and mother agreed upon an individual education plan for C.R. and noted in the plan that C.R. interacted appropriately with his peers, respected authority, maintained attention to task, adjusted easily to new situations, and did not exhibit significant behavior problems which adversely affected his educational performance. (R. 125, 131, 137).

Moreover, as observed by the ALJ, C.R.'s report cards are not indicative as a person who is not paying attention. In fact, in the 1999–2000 school year (Kindergarten), C.R.'s teacher wrote on October 28, 1999, that he was a joy in her class and, at the end of the school year, she promoted him to first grade. (R. 120–121). In the first nine weeks of the 2000–2001 school year (1st grade), C.R. received grades of 89 in Reading, 94 in Other Language Arts, 98 in Mathematics, 94 in Science, and 95 in Social Studies. (R. 119). In the second nine weeks of the 2000–2001 school year, C.R. received grades of 93 in Reading, 98 in Other Language Arts, 97 in Mathematics, 98 in Science, and 95 in Social Studies. (R. 118). Halfway through the first grade, C.R. was determined to have a moderate speech impairment and

began receiving speech therapy for one hour per week. (R. 97, 113, 128).

In April 2001, C.R.'s first grade teacher reported that C.R. was "inquisitive and curious during lessons," was "completely on task," and excelled in "all academic areas." (R. 168). She further opined that C.R. had a "superior" ability to follow oral instructions, comprehend classroom discussion, and remember information just heard. (R. 169). Additionally, she stated that C.R. had an "above average" ability to adapt to new situations without getting upset, retain instruction from week to week, exhibit organization in accomplishing tasks, and complete tasks on time. (R. 169). C.R. reportedly had an "average" ability to express himself adequately, initiate activities independently, and respond appropriately to praise and correction. (R. 169).

Finally, in the second nine weeks of the 2001–2002 school year (second grade), C.R. received grades of 77 in Reading, 90 in Other Language Arts, 95 in Mathematics, 85 in Science, and 94 in Social Studies. (R. 173). The report card also indicated that C.R. needed improvement in classroom participation, working with others, and following classroom rules. (R. 173).

The teachers' reports from 1999–2002, offer the most longitudinal information and opinions of C.R.'s academic accomplishments, behavior, and ability to stay on task. Moreover, C.R.'s academic progress and the teachers' reports undermine Richardson's contention of disability. Accordingly, it was appropriate for the ALJ to focus on these records (as opposed to one time assessments prepared to support C.R.'s disability application) and find that C.R. did not have marked limitations in this domain.

### c. "Caring for Yourself"

The record does not support Richardson's contention that C.R. has marked or extreme limitations in the domain of "caring for himself." In the January 2001 Functional Report, Richardson indicated that C.R. was capable of using a zipper by himself, buttoning his clothes, tying his shoelaces, brushing his teeth, eating by himself using utensils, and arriving at school on time. (R. 94). Although at the administrative hearing, Richardson testified that she had to assist C.R. with bathing, dressing, and that he refused to do chores (R. 44–46), her testimony was inconsistent with Dr. Ganc's April 2001 evaluation, where he reported under "Daily Activities," the following:

> He is currently living with his mother. He does most things for himself. He goes to school. He gives himself a bath, selects his own clothes, dresses himself, and feeds himself. He is able to button his shirt and tie his shoes. He rides a bicycle, and he does know how to swim. He plays with his friends. At home, he helps his mother some when asked. He takes care of his own personal hygiene.

(R. 193).

■ The ALJ properly considered subjective complaints, presented by Richardson, and adequately explained the complaints he discredited based on specific, contradictory record evidence. (R. 18). It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir.2001); *Scott v. Shalala*, 30 F.3d 33, 35 n. 2 (5th Cir.1994).

In sum, the record does not support C.R.'s contention that he suffers either marked limitations or extreme limitations in the domains of "interacting and relating with others," "attending and completing tasks," and "caring for himself;" thus, the ALJ properly determined that C.R. did

not have an impairment that functionally equaled Listing 112.11.

### 2. *Opinions of Treating Physicians*

■ Richardson contends that the ALJ inappropriately minimized the findings, conclusions and diagnoses of C.R.'s treating physicians in favor of non-treating physicians and failed to give due deference to the records on which the doctors' findings are based. Specifically, Richardson cites to the assessment performed on C.R. by Tomas G. Soto, Ed.D. ("Dr. Soto") and Ted Jolly, a psychologist ("Jolly").

■ It is well settled that the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded considerable weight in determining disability. *See Myers*, 238 F.3d at 621; *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000); *Greenspan*, 38 F.3d at 237; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). Under the regulations, a treating physician is defined as a physician or psychologist "who provides you, or has provided you, with medical treatment or evaluation *and* who has, or has had, an *ongoing* treatment relationship with you." 20 C.F.R. § 416.902 (emphasis added). Generally, an ongoing treatment relationship exists "when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required." *Id.* "[T]he longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the SSA] will give to the source's medical opinion." 20 C.F.R. § 416.927(d)(2)(i). The SSA "will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." 20 C.F.R. § 416.902.

In this case, on the recommendation of his counsel, Dr. Ganc "saw [C.R.] for a full psychiatric evaluation on April 17, 2001, in relation to his appeal for social security disability." (R. 53, 191). Dr. Ganc reported his findings to C.R.'s counsel on June 1, 2001. Shortly thereafter, on the referral of C.R.'s counsel, on June 20, 2001, Dr. Soto and Jolly saw C.R. for cognitive assessment and to rule out learning disability. (R. 53, 201). These one time visits by C.R. to Dr. Ganc, Dr. Soto, and Jolly do not constitute "ongoing" treatment. *See* 20 C.F.R. § 416.902; *see also Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036–38 (9th Cir.2003). Although the administrative hearing was not conducted until April 2002, there are no medical records reflecting that C.R. received psychiatric treatment from any source. It is clear that the assessments were obtained merely to support C.R.'s disability claim. Consequently, Dr. Ganc, Dr. Soto and Jolly cannot be considered "treating physicians" as that term is defined in the regulations. *See* 20 C.F.R. § 416.902. Thus, contrary to Richardson's contention, the ALJ was not required to afford their opinions and diagnoses controlling weight.

Notwithstanding the fact that he was not required to give the opinions controlling weight, the ALJ did not "disregard" their opinions as claimed by Richardson. Indeed, in his decision, the ALJ acknowledged their assessments as follows:

Dr. Jaime Ganc, a psychiatrist, evaluated the claimant on April 17, 2001, at the request of the claimant's attorney. The claimant's mother reported that the claimant was taking speech therapy at school and that he was immature in his behavior, was easily distractible, and had difficulty in completing any task.

She stated that the claimant was not on any medication. Dr. Ganc reported that the claimant needed help and direction and seemed to be easily distractible. By history, the claimant was able to give himself a bath, as well as select his own clothes, dress himself and feed himself. Daily activities also included riding a bicycle, playing with his friends, and helping his mother when asked. Dr. Ganc diagnosed attention deficit hyperactivity disorder, predominately inattentive type, and expressive language disorder. (Exhibit 4F)

On June 20, 2001, Dr. Ted Jolly, a psychologist, and Tomas Soto, Ed.D., also evaluated the claimant, at the request of the claimant's attorney. The claimant's mother reported that the claimant was hyperactive, cried most of the time, and had "severe" reading problems. It was noted that initially, the claimant was attentive and compliant, but as the evaluation progressed, he became restless and inattentive and his working pace was inconsistent. The report indicated that the claimant was reluctant to speak. The claimant's speech was hindered by work articulation problems and mild to moderate wor[d] cluttering, but his expressions were intelligible when asked to speak slowly and distinctly. Testing was consistent with a developmental disorder in reading and arithmetic computation. (Exhibit 6F)

(R. 13–14). Although Richardson correctly notes that Dr. Ganc and Jolly diagnosed C.R. with ADHD and observed in April and June 2001, respectively, that C.R. exhibited a short attention span, needed close supervision, and was unable to independently care for all of his basic self help needs, as set forth, *supra*, neither C.R.'s school records nor his mother's initial representations in her Functional Report support these opinions. (R. 191–193, 201–205). Likewise, C.R.'s ability to engage in age appropriate activities (*e.g.*, play video games, watch movies, play basketball and kickball with friends, and attend church) is inconsistent with the contention that he has an impairment that meets, equals, or is the functional equivalent of a listed impairment. (R. 18).

Finally, among the factors considered by the ALJ, was that C.R. did not take any medication for ADHD or any other condition. (R. 18, 49). Additionally, C.R. had never been hospitalized or treated in an emergency room setting on a frequent basis. (R. 18). The Court further observes that C.R. does not receive regular, or otherwise, treatment from a mental health professional. (R. 18, 50). Taking all of these factors into consideration, the ALJ correctly determined that C.R. has not been under a disability as defined by the Act.

### III.  *Conclusion*

Accordingly, Richardson's Motion for Summary Judgment (Docket Entry No. 15) is **DENIED,** the Commissioner's Motion for Summary Judgment (Docket Entry No. 18) is **GRANTED,** and the ALJ's decision denying C.R. childhood disability benefits is **AFFIRMED.**

### FINAL JUDGMENT

In accordance with the Memorandum and Order issued this day, it is hereby

**ORDERED** that Richardson's Motion for Summary Judgment (Docket Entry No. 15) is **DENIED.** It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 18) is **GRANTED.** It is finally

**ORDERED** that this matter is **DISMISSED WITH PREJUDICE.**

This is a **FINAL JUDGMENT.**